UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

SHARON MOSKAL,

        Plaintiff,                            Case No. 10-14890
                                                        Honorable Julian Abele Cook, Jr.

v.

AETNA LIFE INSURANCE CO.,

        Defendant.

## ORDER

In this civil action, the Plaintiff, Sharon Moskal, has challenged the decisions by the Defendant, Aetna Life Insurance Co. ("Aetna"), to (1) terminate her short-term disability benefits and (2) deny her request for long-term disability benefits. Currently before the Court are the parties' respective motions for the entry of a summary judgment in their favor.

I.

Moskal was employed as a senior teller for Bank of America ("Bank") - a light-duty position which required her to assist customers, maintain transaction records, supervise other tellers, and perform a variety of administrative tasks. (Admin. Rec. at 7, 184). Moskal reported that, out of an eight-hour workday, she regularly spent approximately two hours sitting, four hours standing, and two hours walking. (Admin. Rec. at 184).

By virtue of her employment, she was eligible to participate in the Bank's employee welfare benefits plan. This plan, which is governed by the Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. § 1001 et seq., includes provisions relating to short-term and long-term

1

disability benefits. Although Aetna administers short-term benefits claims, it does not insure these claims under Moskal's employee plan with the Bank. These benefits are funded and paid directly by the Bank. On the other hand, Aetna does administer and insure long-term benefits claims under her employee plan with the Bank. (Admin. Rec. at 642).

Moskal asserts that she was injured while carrying coin-filled bags at work in November 2008. She first sought and received treatment for this injury in April 2009. Subsequently, her claim for short-term disability benefits was approved by Aetna, with an effective date of May 4, 2009. However, when Aetna terminated these benefits several months later (effective October 1, 2009), Moskal appealed this determination - a decision that was subsequently upheld on administrative review. In November 2009, Moskal was advised by Aetna that she was not eligible to receive any long-term disability benefits. Aetna explained that, unless Moskal could demonstrate a continuing period of disablement for the preceding 180 days, her employee plan would not authorize her to receive the payment of any long-term disability benefits. Any appeal by Moskal of the latter determination was required to be filed by May 2010. However, this period elapsed without her taking action to do so. Instead, she commenced this litigation in December 2010.

II.

Moskal initiated this civil action citing to § 502(a)(1)(B) of ERISA, 29 U.S.C. § 1132(a)(1)(B) (authorizing civil action by participant or beneficiary of ERISA-governed plan "to recover benefits due to [her] under the terms of [her] plan, to enforce [her] rights under the terms of the plan, or to clarify [her] rights to future benefits under the terms of the plan").

In *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 155 (1989), the Supreme Court held that "a denial of benefits challenged under § 1132(a)(1)(B) is to be reviewed under a *de novo*

2

standard unless the benefit plan gives the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan."

When such discretionary authority is granted, an arbitrary and capricious standard of review becomes applicable. This standard "'is the least demanding form of judicial review of administrative action. . . . When it is possible to offer a reasoned explanation, based on the evidence, for a particular outcome, that outcome is not arbitrary or capricious.'" *Hunter v. Life Ins. Co. of N. Am.*, 437 F. App'x 372, 376 (6th Cir. 2011) (unpublished) (quoting *Killian v. Healthsource Providence Adm'rs, Inc.*, 152 F.3d 514, 520 (6th Cir. 1998); *see also Yeager v. Reliance Standard Life Ins. Co.*, 88 F.3d 376, 380 (6th Cir. 1996) (arbitrary and capricious standard is "highly deferential . . . standard of review"). However, "merely because [this] review must be deferential does not mean [it] must also be inconsequential. While a benefits plan may vest discretion in the plan administrator, the federal courts do not sit in review of the administrator's decisions only for the purpose of rubber stamping those decisions." *Moon v. Unum Provident Corp.*, 405 F.3d 373, 379 (6th Cir. 2005). Thus, an examination of the administrative record by the Court "inherently includes some review of the quality and quantity of the medical evidence and the opinions on both sides of the issues." *McDonald v. W.-S. Life Ins. Co.*, 347 F.3d 161, 172 (6th Cir. 2003). The reviewing court is obliged to affirm the administrator's decision "'if it is the result of a deliberate principled reasoning process, and if it is supported by substantial evidence.'" *Hunter*, 437 F. App'x at 376 (quoting *Killian*, 152 F.3d at 520).

Here, because the policy grants Aetna "discretionary authority to determine eligibility for [short-term and long-term disability] benefits and construe the terms of the applicable plan and resolve all questions relating to claims for benefits under the plan" (Admin. Rec. at 636), the more

deferential arbitrary and capricious standard would apply, *e.g.*, *Schwalm v. Guardian Life Ins. Co. of Am.*, 626 F.3d 299, 308 (6th Cir. 2010) (emphasis omitted) (applying arbitrary and capricious standard where policy granted administrator "discretionary authority to determine eligibility for benefits and to construe the terms of the plan with respect to claims"); *Osborne v. Hartford Life & Accident Ins. Co.*, 465 F.3d 296, 299 (6th Cir. 2006) (applying arbitrary and capricious standard where policy granted administrator "full discretion and authority to determine eligibility for benefits and to construe and interpret all [of its] terms and provisions").

However, Moskal points out that, as of July 1, 2007, insurers are prohibited by Michigan administrative rules from including a discretionary clause in any policy or contract issued to any person in this State, and the inclusion of any such clause is void and without effect. *See* Mich. Admin. Code r. 500.2202(b), (c). This rule "does not apply to contract documents in use before that date, but does apply to any such document revised in any respect on or after that date." *Id.* The Sixth Circuit has recently held that this rule is not preempted by ERISA. *Am. Council of Life Insurers v. Ross*, 558 F.3d 600 (6th Cir. 2009).

Aetna argues that this provision is inapplicable to the short-term disability benefits at issue because they were not offered through an insurance policy. Rather, Aetna submits that they were funded and paid directly by the Bank. The administrative record before the Court confirms this assertion (Admin. Rec. at 642), and Moskal has not responded to this argument. Moreover, the few cases that have addressed this provision have not provided any basis for extending its requirements to non-insurance benefits. Thus, the discretionary clause is not rendered void by Mich. Admin. Code r. 500.2202 (c) with respect to the short-term disability benefits, and the arbitrary and capricious standard applies.

However, the question is considerably more complicated with respect to the long-term disability benefits. These benefits are offered through a policy of insurance that was issued by Aetna. (Admin. Rec. at 417). However, Aetna argues that Mich. Admin. Code r. 500.2202 does not apply to this policy because it was issued in the State of Connecticut and expressly provides that it is "governed by applicable federal law and the laws of North Carolina." (Admin. Rec. at 417-418). "In determining [whether to enforce a choice-of-law provision] in an ERISA case, this court's analysis is governed by the choice of law principles derived from federal common law. In the absence of any established body of federal choice of law rules, we begin with the Restatement (Second) of Conflicts of Law." *DaimlerChrysler Corp. Healthcare Benefits Plan v. Durden*, 448 F.3d 918, 922-28 (6th Cir. 2006) (citations and internal quotation marks omitted) (engaging in several page analysis and concluding that Michigan law, rather than contractually-chosen law, should apply). *But see id.* at 928-29 (Merritt, J., dissenting) (overriding policy of uniformity behind ERISA framework counsels against engaging lengthy, complex, convoluted, and unpredictable choice-of-law analysis and in favor of enforcing the parties' choice-of-law provision); *Morrison v. Unum Life Ins. Co. of Am.*, 730 F. Supp. 2d 699 (E.D. Mich. 2010) (enforcing Maine choice-of-law provision and therefore finding Mich. Admin. Code r. 500.2202 to be inapplicable). However, the Court need not engage in such a choice-of-law analysis here because, as will be seen, the standard of review is not outcome determinative in this case. The Court will assume - without deciding - that the de novo standard of review applies to Aetna's determination to deny Moskal's request for long-term disability benefits.

III.

A.

5

With respect to the short-term disability benefits at issue, a claimant will be deemed to be disabled if, due to sickness, injury, or pregnancy for which she is receiving and complying with appropriate care and treatment from a licensed physician on a continuing basis, she is unable to perform all of the material and substantial duties of her occupation. (Admin. Rec. at 537). The claimant is responsible for providing medical documentation to substantiate the disability, and the administrator retains the final authority to evaluate the claim. (Admin. Rec. at 538). Short-term disability benefits may commence following a seven-day waiting period, and are available for - at the maximum - the following twenty-five week period. (Admin. Rec. at 537).

With respect to long-term disability benefits, the period of disability begins "on the first day [the claimant is] disabled as a direct result of a significant change in [her] physical or mental condition occurring while [she is] insured under this Plan." (Admin. Rec. at 335). The claimant must provide proof of the nature and extent of the disability (Admin. Rec. at 342), and must be under the regular care of a licensed physician who has the medical training and clinical expertise that is suitable to treat the disabling condition (Admin. Rec. at 335, 346). Long-term disability benefits are payable only if the disability continued during and beyond the preceding 180 days ("the elimination period"). (Admin. Rec. at 335, 355). After the elimination period, these benefits are payable for up to eighteen months if the claimant is "not able to perform the material duties of [her] own occupation solely because of [her] disease or injury . . . and [her] work earnings are 80% or less of [her] adjusted predisability earnings." (Admin. Rec. at. 334). The term "own occupation" means "the occupation [that the claimant is] routinely performing when [her] period of disability begins . . . and will be viewed as it is normally performed in the national economy." (Admin. Rec. at 346). Once this eighteen-month period elapses, a claimant will be considered disabled only if she

is "not able to work at any reasonable occupation" because of the disease or injury. (Admin. Rec. at 334).

Aetna initially approved Moskal's claim for short-term disability benefits with an effective date of May 4, 2009. (Admin. Rec. at 306). This determination by Aetna was based upon the recommendation of her treating physician, Dr. Mark Werner,[1] that she stop working. Dr. Werner, in turn, based this recommendation upon (1) the results from magnetic resonance imaging tests which revealed herniated discs at the C4-C5 and C5-C6 levels, mildly bulging discs at the C3-C4 and C6-C7 levels, and mild spinal cord compression, and (2) Moskal's self-reported arm and neck pain, as well as the lack of range of motion in her neck. He prescribed a non-steroidal anti-inflammatory drug and muscle relaxants for her condition. In June 2009, he completed an Attending Physician Statement form in which he opined that Moskal was "totally disabled," and was severely limited in her functional capacity and incapable of performing even sedentary work. (Admin. Rec. at 218). In July 2009, Dr. Werner indicated in his treatment notes that Moskal "need[ed] permanent disability." (Admin. Rec. at 207). On August 13, 2009, Dr. Werner completed another Attending Physician Statement wherein he opined that his patient was under a "total disability," with an undetermined estimated date of return to work.[2] (Admin. Rec. at 205-206).

Aetna subsequently asked Dr. Gerald Goldberg[3] to review Moskal's case file and to

---

[1] Aetna points out that Dr. Werner is an obstetrician/gynecologist - and not a specialist in pain management or orthopedics.

[2] Although Dr. Werner opined that Moskal was totally disabled, the section on this form for "objective findings that substantiate impairment" was left blank. (Admin. Rec. at 206). He also replied "no" to the question of whether, in his opinion, she was motivated to return to work.

[3] Dr. Goldberg is certified by the American Board of Psychiatry and Neurology. (Admin. Rec. at 201).

7

determine whether the failure of conservative medical treatment to date suggested that surgical treatment could resolve her condition or if, instead, she should be considered to be totally disabled. (Admin. Rec. at 201).

After reviewing Dr. Werner's Attending Physician Statements and treatment notes, and in the absence of any neurologic evaluation which suggested evidence of some neurologic deficits, Dr. Goldberg was of the view that the Moskal's medical record did not support her claimed inability to work at her current occupation. (Admin. Rec. at 200-201). He also noted that additional information - including an updated neurosurgical or neurologic evaluation with specific reference to Moskal's functional abilities and specific neurologic deficits - would be helpful in fully evaluating her claim. (Admin. Rec. at 202).

Acting upon Dr. Goldberg's review, Aetna advised Moskal that her short-term disability benefits would be terminated as of October 1, 2009. (Admin. Rec. at 277-278). Aetna also advised her that, in order to substantiate any claims of functional impairments on appeal, she would need to submit additional clinical information and medical documentation that would specify the reasons why she is unable to perform the core elements of her own occupation. (Admin. Rec. at 277). A timely request for an administrative review of this determination followed. (Admin. Rec. at 189). In November 2009, Aetna advised Moskal that she was ineligible to receive long-term disability benefits because, with the termination of her short-term disability benefits in October of 2009, she would be unable to demonstrate the requisite continuous period of disablement for the preceding 180 days. Moskal did not appeal this determination.

In the meantime, acting upon Dr. Werner's suggestion, Moskal began physical therapy

treatment on May 4, 2009 with Dr. Raghu Chovvath.[4] She completed this first course of physical therapy several weeks later (May 29th). The therapy records indicate that, at the time of her initial evaluation, her subjective pain score ranged from four to five on a ten-point scale. (Admin. Rec. at 156). Upon discharge, her condition was marked as "improved," and it was noted that she had "reached max [sic] potential at this time" regarding her short-term and long-term therapy goals. (Admin. Rec. at 157-158).

In July of 2009, Dr. Werner referred her to Dr. Teck Mun Soo,[5] who noted that, in addition to the results from the magnetic resonance imaging tests, his examination and a cervical x-ray revealed the loss of cervical lordosis, a loss of disc space height from C3 to C7, and a large anterior osteophyte formation at C45. (Admin. Rec. at 211). At that time, Moskal identified her pain level at seven on a ten-point scale. (Admin. Rec. at 210). Dr. Soo noted that (1) Moskal could stand, sit, and walk for an unlimited amount of time, (2) her posture was normal and there was no local tenderness along her spine, (3) her cervical spine range of motion was limited to 60-70% in all directions, and (4) the motor strength in her hands and arms and the sensation along her spine were normal. (Admin. Rec. at 210-211). Based upon his examination, it was his recommendation that surgery be reserved as a treatment of last resort. Rather, it was his opinion that Moskal should continue with conservative treatment, including cervical epidural steroid injections. (Admin. Rec. at 212).

---

[4]Dr. Chovvath is a doctor of physical therapy, an orthopedic clinical specialist, and a Fellow of the American Academy of Orthopaedic Manual Physical Therapists. (Admin. Rec. at 134).

[5]Dr. Soo is Diplomate of the American Board of Neurological Surgery and the Chief of Neurosurgery at Providence Hospital and Medical Centers. (Admin. Rec. at 212).

Under the care of Dr. Jeffrey Kimpson,[6] Moskal received a series of three cervical epidural injections in September 2009. (Admin. Rec. at 167-169). At her initial evaluation, Moskal identified her pain level at eight on a ten-point scale. (Admin. Rec. at 160). Dr. Kimpson also noted (1) the presence of a positive Spurling's sign on the right,[7] which, in his opinion, suggested cervical radiculopathy, and (2) decreased sensation in the right C6 dermatomal distribution. (Admin. Rec. at 161). Moskal reported receiving no improvement from the first injection and a 60% improvement from the second injection. However, in October, she returned to Dr. Kimpson, reporting that the pain had worsened and, in her judgment, was now at six on a ten-point scale. (Admin. Rec. at 164). Dr. Kimpson noted that the range of motion of her cervical spine was severely limited in flexion and extension. (*Id.*). Acting upon his recommendation, Moskal underwent two diagnostic cervical facet nerve blocks. (Admin. Rec. at 164-166). He noted that Moskal would be a candidate for radiofrequency lesioning if she could obtain significant relief from the nerve block procedure. (Admin. Rec. at 164). However, the record contains no further information regarding the success, if any, of this course of treatment.

On October 19, 2009, Moskal began a second series of physical therapy treatments which lasted until November 16, 2009. (Admin. Rec. at 129). At the initial evaluation, she estimated that her level of pain ranged from six to eight on a ten-point scale. (Admin. Rec. at 132). At the time of her discharge from this round of treatment, her short-term and long-term treatment goals were

---

[6]Dr. Kimpson is the Medical Director of the Providence Hospital Pain Management Center, Diplomate of the American Academy of Pain Management and the International Spinal Injections Society, and a Fellow of the American Academy of Disability Evaluating Physicians. (Admin. Rec. at 161).

[7]However, the physical therapy records all noted that the Spurling's tests were negative. (Admin. Rec. at 153, 157, 133, 130, 127).

all noted to be mostly or partly satisfied. Moskal reported that she was feeling better but was still experiencing pain. (Admin. Rec. at 129-131). Her cervical range of motion had improved, but was still limited. (Admin. Rec. at 130).[8]

On November 11, 2009, Dr. Werner opined that Moskal was "totally disabled until further notice." (Admin. Rec. at 177).

In December 2009, Aetna asked Dr. Andrea Wagner[9] to perform an independent review of the case file to determine (1) if Moskal's medical records supported her claimed functional impairments and (2) what reasonable work restrictions and/or accommodations, if any, would enable her to perform her current occupation, which was characterized as "light duty." (Admin. Rec. at 108-112). Upon completing the review, Dr. Wagner proffered a report on January 5, 2010, in which she expressed the belief that Dr. Werner's total disability evaluation of his patient was not supported by any objective basis. On the contrary, she opined that Moskal was not precluded from performing her light-duty occupation so long as she was restricted to only occasionally lifting, pushing, or pulling objects greater than ten pounds.

On January 11, 2010, Aetna notified Moskal that its prior decision to terminate her short-term disability benefits had been upheld. (Admin. Rec. at 240-242). The summary of the medical records and conclusions therein largely followed those in Dr. Wagner's report.[10]

---

[8]The record appears to reflect that Moskal returned to physical therapy on December 1, 2009, because she still had symptoms of pain and discomfort. (Admin. Rec. at 126). There are no further records that would indicate whether she continued this series of therapy sessions.

[9]Dr. Wagner is Diplomate of the American Board of Electrodiagnostic Medicine and Physical Medicine and Rehabilitation, and is a Fellow of the American Academy of Physical Medicine and Rehabilitation and the North American Spine Society. (Admin. Rec. at 112).

[10]The administrative record also contains a projection by Dr. Werner that Moskal would be totally disabled for the remainder of her life. (Admin. Rec. at 99). This assessment appears to

B.

Moskal contends that the denial of her short-term disability benefits was arbitrary and capricious because Aetna (1) had relied almost exclusively on Dr. Wagner's peer review of the medical record while ignoring the opinions of those doctors who had actually conducted physical examinations of her; and (2) was operating under a conflict of interest because it evaluates short-term and long-term disability benefits claims while also serving as the entity responsible for paying out the long-term disability benefits. Moskal also argues that, because the denial of long-term disability benefits was based entirely on the rejection of her short-term disability benefits claim, that determination, too, was arbitrary and capricious. Aetna not only disagrees with these arguments, but also maintains that her long-term disability benefits claim should be dismissed because she failed to exhaust her administrative remedies prior to commencing this litigation.

As Aetna concedes, the Supreme Court has held that a structural conflict of interest exists when the same entity serves in the dual roles of rendering benefits decisions and paying benefits to successful claimants. *Metro. Life Ins. Co. v. Glenn*, 554 U.S. 105, 112-14 (2008). However, as Aetna stresses, the existence of such a conflict does not change the standard of review that is applicable to a denial of benefits claim. *Id.* at 115-16. Instead, where the administrator has discretionary authority, the deferential standard still applies to the benefits assessment, and "conflicts are but one factor among many that a reviewing judge must take into account." *Id.* at 116; *see also Conkright v. Frommert*, 130 S. Ct. 1640, 1646 (2010) ("[W]hen the terms of a plan grant

---

have been made in conjunction with a request for leave under the Family and Medical Leave Act, 29 U.S.C. § 2601 et seq. However, this medical evaluation was rendered eight months after Moskal's appeal from the initial determination to terminate her short-term disability benefits had been denied. Therefore, this aspect of Moskal's medical history will not be considered by the Court in its assessment of Aetna's benefits determination.

discretionary authority to the plan administrator, a deferential standard of review remains appropriate even in the face of a conflict."). The weight borne by this factor will vary with the circumstances of each case, and it will "prove more important (perhaps of great importance) where circumstances suggest a higher likelihood that it affected the benefits decision, including, but not limited to, cases where an insurance company administrator has a history of biased claims administration and . . . should prove less important (perhaps to the vanishing point) where the administrator has taken active steps to reduce potential bias and to promote accuracy, for example, by walling off claims administrators from those interested in firm finances, or by imposing management checks that penalize inaccurate decisionmaking irrespective of whom the inaccuracy benefits." *Glenn*, 554 U.S. 117.

Here, Aetna does not insure the short-term disability benefits at issue, as these are funded and paid directly by the Bank. (Admin. Rec. at 642). Thus, arguably, there is no conflict with respect to the short-term disability benefits. However, Aetna does insure the long-term disability benefits (*id.*) - and its determination regarding short-term disability benefits directly affects its obligation to pay long-term disability benefits. Thus, although the conflict is perhaps attenuated in these circumstances, it does still exist.

However, it is not sufficient to simply point out that a structural conflict of interest exists. On the contrary, a claimant must "provide significant evidence that the alleged conflict of interest influenced [the administrator's] decision." *Osborne*, 465 F.3d at 300 (citation and internal quotation marks omitted) (decision not arbitrary and capricious where "sole basis of [plaintiff's] conflict of interest claim is the institutional one of [administrator-insurer's] dual capacity"). To do otherwise could "in practice . . . bring about near universal review by judges *de novo - i.e.*, without deference

13

- of the lion's share of ERISA plan claims denials" in light of the commonplace nature of the dual-role arrangement. *Glenn*, 554 U.S. at 116. Here, Moskal has presented no evidence or allegation that Aetna has a history of biased claims administration, and has not otherwise pointed to any specific evidence which shows that the conflict influenced its administrative decisions. *Cf. Evans v. UnumProvident Corp.*, 434 F.3d 866, 880 (6th Cir. 2006) ("[A] series of inter-office e-mails and memos between defendant's customer care specialists . . . discussing the status of plaintiff's [long-term disability] and life insurance claims, and noting that they were 'working on denying this claim' . . . , certainly indicate a predisposition toward terminating plaintiff's benefits and manifest the conflict of interest inherent in defendant's dual role as the decision-maker and payor of the [long-term disability] policy. The administrative record leaves no doubt that defendant's conflict of interest unduly influenced its evaluation of plaintiff's claim."). Similarly, Aetna has proffered no information regarding its internal structure or decision making procedures that would support an argument that the potential impact of the structural conflict had been effectively mitigated.

It appears to the Court that, where there is no direct evidence that an adverse decision was influenced by a facial conflict of interest, the entire inquiry risks circularity. Moskal, in essence, has asked the Court to find that (1) the fact that Aetna made an arbitrary and capricious decision is indirect evidence that its decision must have been influenced by a conflict of interest, and (2) because its decision was influenced by a conflict, it must have been arbitrary and capricious. Rather than getting stuck in this circular argument, the Court instead acknowledges the existence of the structural conflict and will, as instructed by *Glenn*, weigh it along with the other relevant factors. 554 U.S. at 117 ("[T]he word 'factor' implies . . . that when judges review the lawfulness of benefit denials, they will often take account of several different considerations of which a conflict of

interest is one. This kind of review is no stranger to the judicial system. Not only trust law, but also administrative law, can ask judges to determine lawfulness by taking account of several different, often case-specific, factors, reaching a result by weighing all together.").

Turning to the challenged benefits decision itself, the Court, after careful review of the entire record, cannot say that Aetna's decision to terminate Moskal's short-term disability benefits was not the result of a deliberate principled reasoning process or was unsupported by substantial evidence. *Hunter*, 437 F. App'x at 376 (quoting *Killian*, 152 F.3d at 520).

While Aetna's decision was largely premised on the paper-only review by Dr. Wagner, there is "nothing inherently objectionable about a file review by a qualified physician in the context of a benefits determination." *Calvert v. Firstar Fin., Inc.*, 409 F.3d 286, 296 (6th Cir. 2005). In *Calvert*, the Sixth Circuit held that an adverse determination based upon a file review was arbitrary and capricious - not because of the file review per se, but because the file review was "clearly inadequate" where, among other failings, it made no mention of several pieces of objective medical evidence or the claimant's successful Social Security disability benefits determination. *Id.*; *see also Bauer v. Met. Life Ins. Co.*, 397 F. Supp. 2d 856, 864 (E.D. Mich. 2005) ("The reviewer [in *Calvert*] appeared to be ignorant about important parts of the plaintiff's medical history, leading the court to conclude that he had not actually done a thorough review of the plaintiff's medical records. The court found a decision based on such a shoddy review arbitrary and capricious. It was not the paper-only review itself that made a difference, but the poor job the reviewer did.").

Here, Dr. Wagner carefully reviewed the evidence and came to a reasoned conclusion that it did not support a finding of disability. In addition to reviewing the entire set of medical records, she consulted with Dr. Chovvath. (Admin. Rec. at 110-111). In her report, she summarized the

15

medical records, which showed ongoing complaints of, and treatment and therapy for, neck and arm pain. She highlighted the relevant clinical findings as summarized above, including (1) the magnetic resonance imaging results, (2) the cervical x-ray examination, (3) the evaluation and recommendations by Dr. Soo, (4) Dr. Werner's opinion regarding Moskal's disablement, and (5) Dr. Kimpson's evaluation and treatment. In a peer-to-peer consultation, Dr. Chovvath stated that (1) Moskal's range of motion and strength were intact and functional, (2) she was completely independent on a home program and was functional, and (3) her pain had decreased, but had not been fully resolved, due to the therapy and the various treatments and procedures that she underwent. Based on these assessments, Dr. Chovvath opined that Moskal was functional on at least a sedentary level. Dr. Wagner also noted Dr. Soo's notation that Moskal was not limited in standing, sitting, or walking. It was Dr. Wagner's opinion that the findings by Dr. Kimpson of a positive Spurling's test and decreased sensation - as well as the effects of her herniated discs - would be properly accounted for by the ten-pound restriction, and that no further restrictions would be needed.

Contrary to Moskal's assertions, Dr. Wagner did consider the evidence provided by her treatment providers. It is true that Dr. Wagner did not credit Dr. Werner's assertion that she was permanently disabled. However, as discussed above, there is ample evidence from other treatment providers who specialize in the neurology, pain management, and physical therapy fields - such as Drs. Soo (Moskal was not limited in her standing, sitting, and walking) and Chovvath (Moskal was functional on at least a sedentary level) - whose evaluations of Moskal significantly undermined Dr. Werner's ultimate conclusions. Moreover, the record does not indicate that Dr. Werner ever

performed any sort of functional capacity assessment.[11] Dr. Wagner's assessment that "quality and quantity of the medical evidence and the opinions on both sides of the issues," *McDonald*, 347 F.3d at 172, supported a determination that Moskal was not precluded from performing her light-level occupation (with the lifting restriction noted above) is well-supported by the record. Moreover, it was neither arbitrary nor capricious for Aetna to rely heavily on Dr. Wagner's careful assessment of the record when making the ultimate determination to affirm the termination Moskal's short-term disability benefits. Finally, and especially in light of the deferential standard of review, this is not the type of close case where the mere existence of a structural conflict of interest - absent any direct evidence that the conflict influenced the benefits decision - can serve as a "tiebreaker when the other factors are closely balanced," *Glenn*, 554 U.S. at 117.

The Court does not minimize the pain that Moskal has experienced. On the whole, the record reflects a continuity of pain that has been experienced by Moskal which has ranged from

---

[11]Moskal states that "Dr. Werner's assessment of [her] functional assessment limited [her] to .5-2.5 hours of sitting, standing, or walking on any day and completely restricted [her] from any repetitive motions, or static neck positions." (Pl.'s Br. in Supp. of Pl.'s Mot. for Summ. J. at 10). However, she fails to provide any citation to the administrative record for this contention. The Court has carefully reviewed the entire record, and can find no such assessment by Dr. Werner. The Court did, however, locate a "Capabilities and Limitations Worksheet" that contains these restrictions. (Admin. Rec. at 186). This worksheet was filled out by Moskal herself in November 2009, and appears to reflect a self-assessment of her functional capacity - and not, as Moskal claims, the assessment of her physician. The record also contains an Attending Physician Statement form that had been filled out by Dr. Werner in October 2009 wherein he states that Moskal should be restricted from bending, stretching, lifting, and repetitive movement on her right side. (Admin. Rec. at 191, 198). However, the section for the level of impairment of her functional capacity was left blank. (Admin. Rec. at 198). On another Attending Physician Statement form (completed in August 2009), Dr. Werner did check off the box next to "No ability to work. Severe limitation of functional capacity; incapable of minimal activity." (Admin. Rec. at 206; *see also* Admin. Rec. at 218 (Attending Physician Statement by Werner indicating "Severe limitation of functional capacity/incapable of sedentary work.")). These conclusions, however, are not supported by an evaluation of her ability to perform various work-related tasks.

17

mild to severe as a result of her neck injury. However, the objective medical evidence in the record does not support a conclusion that this pain has precluded her from performing all the material and substantial duties of her own occupation, as required under the short-term disability benefits policy.

Because the Court has affirmed Aetna's determination with respect to the short-term disability benefits, it follows that the denial of long-term disability benefits cannot be disturbed where the disability did not continue throughout the 180-day elimination period. (Admin. Rec. at 335, 355). Therefore, the Court need not address the issue of whether Moskal's failure to exhaust her administrative remedies is excused on the grounds of futility.

IV.

For the reasons that have been set forth above, (1) Aetna's motion for the entry of judgment (ECF No. 16) is granted and (2) Moskal's motion for the entry of judgment (ECF No. 15) is denied.

IT IS SO ORDERED.

Date: January 10, 2012                     s/Julian Abele Cook, Jr.
                                           JULIAN ABELE COOK, JR.
                                           U.S. District Court Judge

CERTIFICATE OF SERVICE

The undersigned certifies that the foregoing Order was served upon counsel of record via the Court's ECF System to their respective email addresses or First Class U.S. mail to the non-ECF participants on January 10, 2012.

                                           s/ Kay Doaks
                                           Case Manager